IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| NEW LIFE EVANGELISTIC CENTER, INC., <br> A Missouri Not-For-Profit Corporation <br> 1411 Locust Street <br> St. Louis, Missouri 63103 <br>       *plaintiff*, <br><br> v. <br><br> CITY OF ST. LOUIS, MISSOURI, <br> A municipal corporation <br><br>  and <br><br> EDWARD ROTH, in his official capacity <br> as PUBLIC SAFETY DIRECTOR, <br> CITY OF ST. LOUIS, MISSOURI, <br><br>       *defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 4:12-cv-1077 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### **Memorandum in Support of Plaintiff's Motion for Preliminary Injunction**

   In this case Plaintiff New Life Evangelistic Center, Inc., a Christian Chruch operating as a Missouri not-for-profit corporation in good standing, exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code, seeks a declaratory judgment, injunctive relief and damages for the unconstitutional taking of property and interference with free exercise of religion arising from the emergency condemnation order of May 16, 2012 as issued by the City of St. Louis Department of Public Safety Division of Building and Inspections.  New Life is likely to succeed on its claims, and a preliminary injunction is necessary to set aside the irreparable harm done to New Life.   No harm will come to the Defendants by this injunction and the public interest will be served.

## I.     BACKGROUND

### A.     New Life Evangelistic Center, Inc. and the outreach from Vandeventer

New Life is a Christian Church operated as a Missouri not-for-profit corporation, with over 40 years of experience providing for the needs of the homeless. On May 1, 2012, New Life entered into a one year lease agreement with the owner of certain real property located at 1600-1610 S. Vandeventer Ave.; 1612-1614 Vandeventer Ave.; 4345-4346 McRee Ave.; 4348 McRee Ave; and 4415 Lafayette Ave., in St. Louis, Missouri ("Vandeventer Property") to use the property for religious services and homelessness assistance. The Vandeventer property is a vacant nearly two acre tract of ground with no permanent structures. (Exhibit 1 Rice Declaration)

On May 14, 2012 New Life sent a letter to the City of St. Louis Director of Public Safety informing him of their intent to host services on the Vandeventer property, to place an eight hundred square foot tent on the property for the purposes of hosting worship services on the property. (Exhibit 1 Rice Declaration) (Exhibit 5)

On May 15, 2012, Defendant Roth sent a response to New Life which among other things directed them to facilities that provide shelter or other housing services for the homeless, and laid out vague parameters of what was expected from shelters providing no corresponding ordinances, code citations or permitting requirements. Defendant Roth did not respond to New Life's request regarding religious services. (Exhibit 4)

However in the letter Roth makes clear his intent to have the property condemned before New Life has even occupied the property.  He states that "people who fail to vacate condemned premises will be subject to arrest."  (Exhibit 4) His intent was

2

reinforced by media reports in which he is quoted as stating "anyone who puts up any kind of structure – one tent, five tents, 10 tents will have it removed immediately and the property will be cleared." Roth has also been quoted as saying "the city will use zoning and sanitary laws to quickly remove any tents as soon as they are put up." (Exhibit 6)

At 11:00 am on May 16, 2012 New Life began erecting a 20' by 40' tent on the Vandeventer property, and had one porta potty delivered, on what had otherwise been vacant property. By Noon on May 16, 2021 New Life began to host a worship service under the tent on the Vandeventer property. (Exhibit 1 Rice Declaration)

By 4:00 pm on May 16, 2012, fifteen (15) people were present on the Vandeventer Property for New Life's worship services. The only structures on the property included the 40' by 20' tent and eight smaller tents. No food preparation or storage was taking place on the property. No electrical services was being provided or generated for the property and no open fires were present on the property. (Exhibit 1 Rice Declaration)

At 5:00 pm on May 16, 2012 the City of St. Louis Department of Public Safety Division of Building and Inspection issued an emergency condemnation of the Vandeventer property. Stating that pursuant to Section 120.1 of Ordinance #68788, being the Emergency Condemnation provisions of the International Building Code, an inspection of the property had been made, and that the inspection revealed that the building(s) and/or premise(s) pose and immediate or imminent danger to public health, safety or welfare… and they cannot be made reasonably safe without immediate evacuation… The violations that lead to this immediate or imminent danger were listed on the second page of the notice as "The building, structure or premises has been

3

constructed, exists or is being maintained in violations of this code or law. Sec119." (Exhibit 2)

At 6:30 pm on May 16, 2012 City of St. Louis Police officers arrived to disperse all present, and took into custody four people including Rev. Larry Rice, New Life's co-founder and President, for occupying a condemned building. (Exhibit 1 Rice Declaration)

### C.     City of St. Louis Building Code

Per the emergency condemnation order of May 16, 2012 the Building Code of St. Louis can be found in Ordinance #68788. ("the Code") This Ordinance states that it is an amendment to the 2003 International Building Code with the 2009 International Building Code.

The intent of the Code is set out in section 103.1 which states:

The purpose of this code is to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributed to the built environment and to provide a reasonable level of safety to fire fighters and emergency responders during emergency operations." (Exhibit 3)

Section 105 of the Code establishes what work requires a permit, and expressly exempts the necessity of a permit for "tents smaller than one thousand (1000) square feet, or those used for private family events on the same lot as the owner's residence." (Exhibit 3)

Section 109 of the Code establishes the fees for permits.  The table contained in the Code at section 109.3.1 lists in its table the item for which the permit is requested, the

4

fee, the minimum fee, the relevant code section, and remarks and requirements.  Tents are listed and reference a section 109.2.6 of the Code and include under remarks see Note A. (Exhibit 3)

Section 109.2.6 of the Code addresses tents and amusement booths.

109.2.6 Tents, amusement booths. The fee for a permit for the construction, installation or erection of a tent or amusement booth shall be as listed in Table 109.3.1. This shall include all those for private parties, picnics, carnivals, circuses or traveling exhibitions. (Exhibit 3)

Note A of section 109.3.1 of the Code states:

Tents smaller than one thousand (1,000) square feet, or for private family events on the same lot with the residence are exempt from obtaining a permit, but shall still meet the following conditions.  The use of propane tanks or equipment in the tent requires a separate permit and inspection by the fire official.  Tent permit(s) and the erection and maintenance of tents for the same lot shall not exceed a total maximum of sixty (60) days in any three hundred sixty-five (365) day period. Tent must be supported to withstand wind pressures of twenty (20) lbs. per square foot minimum .  Tent must stay ten feet from tent walls to buildings and to interior lot lines.  Tents for forty-nine (49) persons or less must have one (1) exit to the exterior.  Tents for fifty (50) to four hundred ninety-nine (499) persons must have two (2) remote exits to the exterior.  Tents for five hundred (500) to nine hundred ninety-nine (999) persons must have three (3) remote exits to the exterior.  Exit and emergency lighting shall be required.  Tents must stay four (4) feet minimum from interior lot lines.  Tents must be supported to withstand a

5

wind speed of ninety (90) miles per hour (mph), Exposure B.  The use of propane tanks or equipment in the tent requires a separate permit and inspection by the fire official. (Exhibit 3)

Section 120.1 of the Code defines the power of the building official in emergency measures and states:

120.1 Procedure. When, in the opinion of the building official, a building, structure or premises poses an immediate or imminent danger to the public health, safety or welfare, as defined in Section 118.1, the building official shall order the immediate evacuation and securing of said building, structure or premises, and shall be permitted to order all utilities to be disconnected without sending a notice. Each principle entrance shall be posted with a notice which reads as follows:

DANGER

THIS PREMISES IS UNSAFE AND HAS BEEN

CONDEMNED

ALL PERSONS ARE WARNED TO

KEEP AWAY

Any person who refuses to leave, interferes with the evacuation of other occupants, occupies or continues any operation after the property has been posted pursuant to this section, except such person(s) who is directed to perform work to remove a violation or unsafe condition, shall be deemed in violation of this section, and it shall be the duty of the Police Department to immediately remove such person(s) from said building, structure or premises, and prevent anyone,

6

unless approved by the building official, from re-entering the building, structure or premises until such time that the Police Department shall have been notified that the same is in a safe condition. The building official assumes no responsibility for persons entering upon said property, and said persons proceed at their own risk and assume all liability. (Exhibit 3)

This emergency condemnation power in section 120.1 specifically lists section 118.1 of the Code as defining "when a building, structure or premises poses an immediate or imminent danger to the public health, safety or welfare." Section 118.1 of the Code in Ordinance #68788 states:

118.1 General. All work shall be conducted, installed and completed in a neat, workmanlike and acceptable manner so as to secure the results intended by this code. (Exhibit 3)

It would appear from the Code that either a definition was left out of the City's enacted ordinance or it is more concerned with workmanship than safety, either way the City does not have a clear statutory definition of when a building, structure or premises poses an immediate or imminent danger to the public health, safety or welfare.

From the Ordinance cited by the City and from the condemnation order issued, it is still not clear how the presence of tents less that 1,000 square feet would violate the Code, much less how the presence of people worshiping and praying created and imminent danger to public health, safety or welfare.

## II. Standard for Preliminary Injunction

A district court has broad discretion when ruling on preliminary injunction requests. *Coca-Cola v. Purdy*, 382 F.2d 774, 782 (8th Cir. 2004). Traditionally, courts

7

must analyze four factors: (1) whether there is a substantial likelihood that the plaintiff will succeed on the merits; (2) whether the plaintiff will be irreparably injured if an injunction is not granted; (3) whether an injunction will substantially injure the non-moving party; and (4) whether the public interest will be furthered by the injunction. Fed. R. Civ. P. 65; *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)(enbanc).

### A. Likelihood of Success on the Merits is High

As stated above and explained below, Defendants improperly deprived New Life of its property without an opportunity for a hearing, and at a time when extra ordinary or emergency conditions involving public health or safety did not exist. This taking occurred in the midst of worship and prayer services and has interfered with New Life's free exercise of its religion. For these reason, New Life's likelihood of success on the merits is very high.

The Due Process Clause requires notice and an opportunity to be heard incident to a deprivation of life, liberty or property by the government. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306. 313 (1950). The government must provide the required notice and opportunity to be heard "at a meaningful time and in a meaningful manner." *Funetes v. Shevin,* 407 U.S. 67, 80 (1972). In order to prove a procedural due process violation, the plaintiff must show (1) that he had a protected property interest at stake and (2) that he was deprived of that interest without due process of law. *Hopkins v. Saunders,* 199 F.3d 968, 975 (8th Cir. 1999).

"Due process is flexible and calls for such procedural protections as the particular situation demands." *U.S. v. Shelton Wholesale, Inc.,* 34 F.Supp.2d 1147, 1151

(W.D.Mo.1999)(quoting *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14 n. 15 (1978)(quoting *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). "Due process analysis requires the balancing of three competing interests: (1) the private interest that will be affected by official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional safeguards; and (3) the government's interest." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Under these basic tenants the right to be heard is a key Constitutional aspect and a responsibility of the government to follow in obtaining a fair decision when the government seeks to deprive a person of property.  A hearing on the matter should bring to light facts and concerns and reduce the likelihood of unfair or mistaken deprivation of property.  Allowing for a person to speak up before a decision is made allows for a greater faith in the system.  Notice of the hearing also provides public faith in a system.  "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . (And ) no better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Fuentes,* 407 U.S. at 80-81.

"[T]he Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect." *Id.* at 82. The requirement that a hearing take place before the deprivation of property does not apply in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* at 82.

If an extraordinary or emergency situation does not exist, a hearing must be provided before a deprivation of property occurs and a subsequent hearing will not satisfy due process. *U.S. v. James Daniel Good Real Prop.,* 510 U.S. 43, 44 (1993). "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *James Daniel Good Real Prop.,* 510 U.S. at 53.

1. **New Life has a protectable property right**

In order to prove that New Life has a protected property interest, it must show that he had a "legitimate claim of entitlement" to a benefit that is derived from a source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Possessory interests in a leasehold invoke due process protections. *Fuentes,* 407 U.S. 87.   Under Missouri law a lease is a conveyance of an estate in land. See *Max Stovall Const. Co., v. Villager Homes, Inc.,* 754 S.W.2d 5, 9 (Mo. App. 1988)  It "creates an estate in the tenant with transfer of exclusive possession and control of the premises to the tenant subject to such conditions as may be imposed by the terms of the contract creating the tenancy." *C & J. Delivery, Inc, v. Vinyard & Lee Partners, Inc.,* 647 S.W.2d 564 (Mo. App.1983)  Accordingly, Missouri courts have long spoken of leasehold interests in terms of title. *See Cantrell v. City of Caruthersville,*  221 S.W.2d 471, 479 (Mo. 1949) (referring to "title to some interest such as … a leasehold estate");  *Thomas v. Utilities Bldg. Corp.,* 74 S.W.2d 578, 579 (Mo. 1934) (describing case as an "action to determine title to a leasehold estate"); *Smith v. Hainline,* 253 S.W. 1049 (Mo. Banc 1923) (describing case as "a suit in equity to determine the title to a leasehold interest"); *Tongay v. Franklin County Mercantile*

*Bank,* 735 S.W.2d 766, 770 (Mo.App. 1987) (referring to slander of leasehold as an "attack on the plaintiff's title"); *Long v. Rucker,* 164 S.W. 170, 171 (Mo. App. 1914) (mentioning the "vitriolic attack … on plaintiffs' leasehold title").

So New Life by virtue of its lease on the Vandeventer property has legitimate claim of entitlement to the property, and therefore a protectable property right.

**2.      Defendants actions denied New Life Due Process**

In this instance the Defendants initiated an emergency condemnation. By this action they proceeded in summary fashion without any prior notice or hearing. The requirement that a hearing take place before the deprivation of property does not apply in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Fuentes* , 407 U.S. at 82.

The Supreme Court in *Fuentes* has provided a three-prong test to determine if a situation is so extraordinary so as to allow notice and opportunity for a hearing to be postponed. *Fuentes,* 407 U.S. at 90-91. The first prong is whether "the seizure has been directly necessary to secure an important governmental or general public interest." *Id.* The second prong is whether "there had been a special need for very prompt action." *Id.* The final prong is whether the state kept strict control over its monopoly of legitimate force and whether the person initiating the seizure was a "government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Id.*

For the first prong of governmental or public interest, the building Code on its face is a governmental interest to protect the health and safety of the public.  However, in this instance the Defendants provide no facts to indicate what specific important

11

governmental or general public interest was being protected.  The only statement is "the building, structure of premises has been constructed, exists or is being maintained in violation of the provisions of this code or law.  Tents less than 1000 square feet require no permits, under this same code cited by the Defendants. These were the only structures on the property. It is unclear what important governmental interest was being protected if the Code already exempted tents.

The second prong is a special need for prompt action.  The Vandeventer property had only been occupied for five hours for worship services.  Fifteen people were on the two acre premises at the time of the condemnation notice.  No open fires were present, and no electricity was being generated on the property.  No food was being stored or prepared.  The Defendants can simply make no case that prompt action was necessary.

Having failed to meet the first two prongs of the test the third is moot as to whether the state kept strict control over its monopoly of legitimate force, and whether the person initiating the seizure was a "government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance."

3. **New Life was denied its right to free exercise of religion.**

The first amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...." In *Cantwell v. Connecticut,* 310 U.S. 296 (1940) the Supreme Court held that the free exercise clause was applicable to the states through the fourteenth amendment. The Supreme Court has crafted a sequential analysis for scrutinizing claims arising under the Free Exercise Clause. In this analysis, the preliminary inquiry is whether the challenged

12

governmental action does in fact create a burden on the exercise of the claimant's religion. *See United States v. Lee,* 455 U.S. 252, 256 (1982).

In this case the challenged action does create a burden on New Life's exercise of religion. An emergency condemnation without a factual basis for such action has denied New Life the ability to use its land for religious purposes.

If such a burden is established, it becomes necessary to consider the nature of the burden, the significance of the governmental interest at stake, and the degree to which that interest would be impaired by an accommodation for the religious practice. *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)

As stated above the governmental interest in this case is unclear, no immediate danger to the public health, safety or interest was evident. Notice of violations before the condemnation could have prevented the interference with New Life's free exercise if there were a present threat to health or safety.

### B. New Life will be Irreparably Injured if an Injunction is not Granted

New Life will be irreparably injured if this court does not grant an injunction. New Life and the individuals and families that it serves have been deprived of the use of the Vandeventer Property unless the Court intervenes. Defendants actions have chilled New Life's first amendment rights to free exercise of religion, and the President of the organization Rev. Larry Rice has been arrested and confined.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976); see also *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). New Life did lose its

First Amendment rights to freedom of exercise by the Defendants action on May 16, 2012.

### C. There is No Injury to the Non-Moving Party and Public Policy Favors Issuing and Injunction in this Case

New Life will continue to be harmed if the injunction is not granted, and its first amendment freedoms are restricted by the threat of prosecution for occupying condemned property, and inability to use its land. The balance of equities generally favors the constitutionally protected freedoms *See Phelps-Roper,* 545 F.3d at 690.

### D. An injunction will serve the public interest

"It is always in the public interest to protect constitutional rights." *Id.* at 689. Because New Life has demonstrated a likelihood of success on the merits, the public interest is served by preventing the continuation of a likely unconstitutional enforcement of an emergency condemnation order while this case is considered on the merits. The public interest supports an injunction that is necessary to prevent a government entity from violating the constitution. *Doe v. South Iron R-1 School District.,* 453 F.Supp.2d 1093, 1103 (E.D.Mo. 2006)

### Conclusion

Wherefore having established the necessary requirements for issuance of a preliminary injunction in this matter, New Life respectfully requests that this court enter a preliminary injunction against the Defendants and all persons acting in concert with them in regard to the Vandeventer Property. New Life also requests that bond be waived or be set at a nominal amount as no financial harm will come to the Defendants as a result of a preliminary injunction in this matter.

                    Respectfully submitted,


                    __/s/ Daniel Patrick Boyle__
                    Daniel P. Boyle 50922MO

                    The Boyle Law Firm, L.L.C.
                    755 Rue St. Francois
                    Florissant, Missouri  63031

                    (314) 838-4500 (telephone)
                    (314) 838-7727 (facsimile)
                    Boylelawfirm@sbcglobal.net (e-mail)

Date: June 19, 2012                A*ttorney for Plaintiff*


Certificate of Service

      A true and accurate copy of the foregoing was served upon the Defendants this 19th day of June 2012 by special process server, along with a copy of the original complaint and summons to appear.  Service has also been made by means of electronic filing with this court.

Service addresses of Defendants

City of St. Louis
c/o Patricia Hageman
City Counselor
1200 Market Street
City Hall Rm. 314
St. Louis, MO  63103

Edward Roth
Public Safety Director
1200 Market Street
City Hall Rm. 401

                    __/s/ Daniel Patrick Boyle___
                      Daniel Patrick Boyle